United States Courts
Southern District of Texas
F I L E D

FEB 10 2025

Nathan Ochsner
Clerk of Court

# **EXHIBIT 1**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

PHI THETA KAPPA HONOR SOCIETY                              PLAINTIFF

VERSUS                                    CIVIL ACTION NO. 3:22-CV-208-CWR-RPM

HONORSOCIETY.ORG, INC. et al                              DEFENDANTS

## ORDER DENYING WITHOUT PREJUDICE MOTION TO QUASH SUBPOENA

Before the Court is Non-Party Toni Marek's [371] Motion to Quash Subpoena. Marek, proceeding *pro se*, asks this Court to grant her Motion to Quash Subpoena and relieve her of any obligation to comply with the subpoenas. Doc. [371] at 4. Marek previously submitted a Declaration in this case. Doc. [289-50]. Honor Society also disclosed Marek as a witness it may call in support of its claims and defenses. Doc. [381-1] at 11.

Marek argues improper service, as she "was never personally handed a subpoena, nor did [she] acknowledge receiving one." Doc. [371] at 1. In December 2024, she received correspondence from Phi Theta Kappa Honor Society ("PTK") apprising her of the attempts to have her served with the subpoenas. Doc. [371-1]. PTK admits it has been unable to personally serve Marek. Doc. [382] at 2–4. Instead, PTK ultimately resorted to taping the subpoenas on the front door of Marek's residence to at least provide Marek with notice. Doc. [381-1] at 36–37; [382] at 4.

Marek further argues this correspondence included threats and intimidation. Doc. [371] at 2. The Court disagrees with Marek's argument here. Among other things, PTK's correspondence served to put Marek on notice. Additionally, it served as a warning to Marek of the potential consequences for evading service of the subpoenas. *See* Texas Penal Code § 38.16. There is evidence Marek has evaded service of the subpoenas. According to one investigator attempting service, the following occurred:

> [Marek] jumped into the truck, locked the doors, and sped away as he approached to serve her the subpoenas. . . . [The investigator] followed her through the residential streets as she made several aggressive turns to evade him. When stopped at a red light twice, [the investigator] exited his vehicle and approached her at the driver's side window. Marek would not roll down the window or make eye contact with him. She eventually did an illegal U-turn and sped away exceeding the speed limit.

Doc. [381-1] at 33.

However, in consideration of Rule 45, the Court finds it lacks jurisdiction to resolve the instant motion. *Diamond Consortium, Inc. v. Manookian*, No. 4:16-CV-94, 2016 WL 9274962, at *2–3 (E.D. Tex. Oct. 25, 2016). It appears the United States District Court for the Southern District of Texas (the Compliance Court)—not this Court (the Issuing Court)—would be the proper situs for filing this motion to quash. *Rotstain v. Trustmark Nat'l Bank*, No. 3:09-CV-2384, 2020 WL 12968651, at *3 n.4 (N.D. Tex. Mar. 10, 2020). The Court notes that, as the Issuing Court, it has previously addressed motions to quash subpoenas to non-parties, but those motions were filed by parties to this case. *See* Doc. [88]; [95]; [305]; [332]; [363]; [390]. In addressing those motions, the Court exercised its power to limit the frequency or extent of discovery. Fed. R. Civ. P. 26(b)(2).

Here, the circumstances are distinguishable. The requirements of Rule 45 serve to protect nonparties and to avoid burdens on nonparties subject to subpoenas. *See* Fed. R. Civ. P. 45, Advisory Committee Notes to 2013 Amendment. And Marek, who is a non-party, is the movant. *See Aldridge v. Cain*, Nos. 1:20-CV-321, 1:22-CV-11, 2023 WL 6929799, at *4 (S.D. Miss. Oct. 19, 2023) (denying, for lack of jurisdiction, a motion to quash filed by a non-party subject to a subpoena). "[E]ven though 'it is true that Rule 45(f) permits the [Compliance Court] to transfer a subpoena-related motion to the [I]ssuing [C]ourt if the person subject to the subpoena consents or if the [Compliance Court] finds exceptional circumstances, [the fact remains] the motion must [still] be filed in the first instance with the [Compliance Court.]" *Diamond Consortium*, 2016 WL

9274962, at *3 (quoting *Trover Grp., Inc. v. Dedicated Micros USA*, No. 2:23-CV-1047, 2015 WL 11117083, at *2 (E.D. Tex. Mar. 27, 2015)); *see SynQor, Inc. v. Vicor Corp.*, No. 2:14-MC-79, 2014 WL 2519242, at *2 (N.D. Tex. June 3, 2014) (finding that Rule 45 provides only the Compliance Court the power in the first instance to determine whether to quash or modify a subpoena or else transfer the motion to the Issuing Court); *see also Paso Del Norte Motors, LP v. Kia Motors of Am., Inc.*, No. 3:15-CV-2672, 2015 WL 4939948, at *1 (N.D. Tex. Aug. 19, 2015) (finding, where court in which the motion to compel and/or transfer was neither Issuing nor Compliance Court, that the court had no authority under either Rule 45 or 37 to rule on the motions). Accordingly, the Court denies the motion without prejudice to refile before the appropriate court.

IT IS THEREFORE ORDERED AND ADJUDGED that Non-Party Toni Marek's [371] Motion to Quash Subpoena is DENIED without prejudice to refile before the appropriate court.

SO ORDERED AND ADJUDGED, this the 30th day of January 2025.

/s/ *Robert P. Myers, Jr.*
ROBERT P. MYERS, JR.
UNITED STATES MAGISTRATE JUDGE

# EXHIBIT 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

PHI THETA KAPPA HONOR
SOCIETY                                                                    PLAINTIFF

VERSUS                                        CIVIL ACTION NO. 3:22-CV-208-CWR-RPM

HONORSOCIETY.ORG, INC. et al                                            DEFENDANTS

### ORDER GRANTING IN PART AND DENYING IN PART
### MOTION TO AMEND/CORRECT CASE SCHEDULE

Before the Court is Defendant/Counter-Plaintiff/Third-Party Plaintiff HonorSociety.Org, Inc.'s ("HonorSociety") and Defendant Honor Society Foundation, Inc.'s ("the Foundation") [142] Motion to Amend/Correct Case Schedule. The Complaint in this matter was filed on April 20, 2022. Doc. [1]. The Court entered a Case Management Order on May 9, 2023. Doc. [59]. Since then, the case schedule has been amended three times. *See* Text Only Order (09/11/2023); Reset Scheduling Order Deadlines/Hearings (02/01/2024); Text Only Order (03/15/2024). The first two motions to amend were joint motions. Doc. [82]; [98]. The third motion was filed by HonorSociety.Org, Inc. and was opposed by Plaintiff/Counter-Defendant Phi Theta Kappa Honor Society ("PTK"). Doc. [109]; [111].

In the most recent amendment to the case schedule, HonorSociety requested that this Court extend the deadlines for expert designation, discovery, and dispositive motions. Doc. [109] at 6. However, in order to keep the trial setting of February 3, 2025, the Court extended each of the deadlines by approximately two months. Text Only Order (03/15/2024). In the instant motion, HonorSociety and the Foundation now request a five-month extension of the deadlines. Doc. [142]. PTK opposes the motion. Doc. [154].

"Rule 16(b) provides that once a scheduling order has been entered, it 'may be modified only

for good cause and with the judge's consent.'" *Fahim v. Marriot Hotel Servs., Inc.*, 551 F.3d 344,

348 (5th Cir. 2008) (quoting Fed. R. Civ. P. 16(b)(4)).  A party must "show that the deadlines

cannot reasonably be met despite the diligence of the party needing the extension." *Id.* (quoting

*S&W Enters., LLC v. Southtrust Bank of Ala., NA*, 315 F.3d 533, 535 (5th Cir. 2003)).  "Four

factors are relevant to good cause: '(1) the explanation for the failure to timely move for leave to

amend; (2) the importance of the amendment; (3) potential prejudice in allowing the amendment;

and (4) the availability of a continuance to cure such prejudice.'" *Id.* (quoting *Southwestern Bell*

*Tel. Co. v. City of El Paso*, 346 F.3d 541, 546 (5th Cir. 2003)).

The parties recently filed amended pleadings.  Doc. [129]; [136]; [138].  These amended

pleadings were permitted by the Court following the evidentiary hearing on March 27, 2024, and

the Court's subsequent Order granting PTK leave to file its Second Amended Complaint.  Minute

Entry (03/27/2024); Doc. [131].  In allowing PTK to file its Second Amended Complaint, the

Court specifically found that discovery deadlines could be pushed back again to cure any prejudice.

Doc. [131] at 14.  HonorSociety and the Foundation are entitled to a reasonable discovery period

which will allow them time to both defend themselves and prosecute their new claims.

In light of these amended pleadings which will require additional discovery on new claims, the

Court finds that there is good cause to modify the case schedule and that at least some extension

of the deadlines is warranted.  *See Stewart v. CitiMortgage, Inc.*, No. 3:15-CV-51-MPM-RP, 2016

WL 10591169, at *3 (N.D. Miss. Oct. 24, 2016) ("[T]he court will extend certain other deadlines

so as to permit limited discovery relating to the new claims but reminds the parties that extensions

are modest and do not allow for delay in conducting discovery.").  But the Court has "exhibited

considerable patience," which has been strained by yet another request for a lengthy extension of

the deadlines. *Grant v. City of Houston*, 625 F. App'x 670, 680 (5th Cir. 2015).  Therefore, the

Court emphasizes that there will be no further extension of the deadlines, absent extraordinary circumstances. Furthermore, the parties are reminded to file any discovery motions "sufficiently in advance of the discovery deadline to allow response to the motion, ruling by the court and time to effectuate the court's order before the discovery deadline." L.U.Civ.R. 7(b)(2)(C).

IT IS THEREFORE ORDERED AND ADJUDGED that the [142] Motion to Amend/Correct Case Schedule is GRANTED IN PART AND DENIED IN PART.

The deadlines will be modified as follows:

| | |
|---|---|
| Plaintiff's Expert Designation Deadline: | August 15, 2024; |
| Defendants' Expert Designation Deadline: | September 16, 2024; |
| Discovery Deadline: | December 19, 2024; |
| Dispositive and Daubert-Type Motions Deadline: | January 16, 2025; |
| Pretrial Conference: | May 2, 2025; and |
| Trial Setting: | June 2, 2025. |

SO ORDERED AND ADJUDGED, this the 7th day of May 2024.

/s/ *Robert R. Myers, Jr.*
ROBERT P. MYERS, JR.
UNITED STATES MAGISTRATE JUDGE

# EXHIBIT 3



**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

| | |
|---|---|
| PHI THETA KAPPA HONOR SOCIETY, ) | Civil Action No. 3:22-cv-00208-CWR-RPM |
| ) | |
| Plaintiff/Counter-Defendant ) | |
| v. ) | |
| ) | |
| HONORSOCIETY.ORG, INC., ) | |
| ) | |
| Defendant/Counter-Plaintiff ) | |
| /Third-Party-Plaintiff ) | |
| ) | |
| HONOR SOCIETY FOUNDATION, INC., ) | |
| ) | |
| Defendant ) | |
| ) | |
| -------------------------------------------------- ) | |
| --- ) | |
| ) | |
| HONORSOCIETY.ORG, INC., ) | |
| ) | |
| Defendant/Counter-Plaintiff ) | |
| /Third-Party-Plaintiff ) | |
| v. ) | |
| ) | |
| DR. LYNN TINCHER-LADNER, ) | |
| ) | |
| Third-Party Defendant | |

## DECLARATION OF RACHEL SMOOT

I, Rachel Smoot, upon my personal knowledge, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

1.     I am one of the attorneys for Plaintiff, Phi Theta Kappa Honor Society ("PTK") and Dr. Lynn Tincher-Ladner ("Tincher-Ladner") in this action. I tender this Declaration in support of PTK's Motion for Sanctions.

2.      Toni Marek ("Marek") is an individual who has willingly inserted herself into this litigation to the purported benefit of Honor Society while refusing to make herself available to PTK.

3.      Within the confines of this lawsuit, PTK first became aware of Marek's likely involvement on or around July 22, 2023, at which time Honor Society served a document production. One of these documents was a screencapture of an email from Marek to another person as if Marek (or another person with access to her personal email account) took the screencapture. Ex. A-1, HS_284261. Since then, Honor Society has produced a number of other documents likely received from Marek, including screencaptures of her conversations with third-parties, draft statements co-authored by Marek regarding PTK and Risley, and even a copy of her deposition transcript from the internal investigation that took place following her accusations.

4.      Several of these documents were submitted in connection with Marek's July 9, 2024 Declaration (Dkt. 289-50) that Honor Society submitted in support of its Opposition to PTK's Second Motion for Temporary Restraining Order, Preliminary Injunction, and/or Gag Order. Marek's Declaration was replete with the same allegations she has previously made against PTK.

5.      Honor Society has never served a subpoena on Marek, but has disclosed Marek as a witness it may call in support of its claims and defenses in this action in its December 13, 2024 Supplemental Rule 26(a)(1) Initial Disclosures. Ex. A-2, 12/13/24 Supp. Rule 26(a)(1) Initial Disclosures.

6.      On October 21, 2024, I caused to be filed a Notice of Intent to Serve Subpoena on Marek (Dkt. 283).

7.      I initially engaged Cleveland Service Agency, Inc. ("CSA") to coordinate a process server in Victoria, Texas, where Marek resides. The process server was unable to serve Ms. Marek,

*See* Exhibit A-3, which is a true and correct copy of the Return of Service I received from CSA's process server.

8.     On October 29, 2024, my co-counsel Mr. Polak emailed Marek at her business email address with a copy of the subpoena and described some of the efforts PTK's process server had already untaken to serve her. (Ex. A-4, 10/29/2024 J. Polak Email.) Marek did not respond.

9.     Following weeks of unsuccessful attempts, PTK requested service of the subpoena through the Victoria County Sheriff's Department. This was also unsuccessful. *See* Exhibit A-5, which is a true and correct copy of the Affidavit of Attempted Service and Official Service Receipt that I received from the Victoria County Sheriff.

10.     On November 22, I retained Veracity IIR ("Veracity") to attempt service of the subpoena. To aid in Veracity's service efforts, I provided Veracity with Marek's social media pages so the server could confirm what Marek looked like.

11.     On or about November 26, 2024, I received a call from Veracity that Veracity's private investigator had pursued Marek in her vehicle but was unable to personally serve her. *See* Exhibit A-6, which is a true and correct copy of the report I received from Veracity's private investigator.

12.     Following her physical evasion of the Veracity process server, Mr. Polak sent a letter to Marek, again including a copy of the subpoena. Ex. A-7, 12/4/24 J. Polak Letter.

13.     On December 19, 2024, Marek served PTK a copy of her Motion to Quash. She did not serve any objections.

Executed on this 2nd day of January, 2025.

/s/ Rachel Smoot
Rachel Smoot
Attorney
Taft Stettinius & Hollister LLP

# EXHIBIT A-1

M Gmail

Toni Marek <tonimarek@gmail.com>

## Toni Marek Contact Information

Toni Marek <tonimarek@gmail.com>
To: lofils@nsca.org

Tue, Jan 13, 2015 at 1:00 PM

Mr. Lofils,

I am sorry I missed your call. I am free most anytime, as my schedule is fairly flexible. Please feel free to call me on the number I left (361-212-1219) after business hours, if need be. I am available between 8am and 9pm central time. If not, I am available tomorrow (all day) as well.

Thank you for your call and again, I apologize for missing it and I look forward to talking to you.

--
**Toni Marek**
*Boca Oxfield Serveco, Inc.*
361-212-1219

Captured by FireShot Pro: 21 July 2023, 20:04:43
https://getfireshot.com

HS_28426

HS_284261

# EXHIBIT A-2

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

| | |
|---|---|
| PHI THETA KAPPA HONOR SOCIETY, | Civil Action No. 3:22-cv-00208-CWR-RPM |
|     Plaintiff/Counter-Defendant, | |
| v. | |
| HONORSOCIETY.ORG INC., | |
|     Defendant/Counter-Plaintiff | |
| HONOR SOCIETY FOUNDATION, INC., | |
|     Defendant. | |
| HONORSOCIETY.ORG INC., | |
|     Defendant/Counter-Plaintiff/Third-Party Plaintiff | |
| v. | |
| LYNN TINCHER-LADNER, | |
|     Third-Party Defendant. | |

### SUPPLEMENTAL RULE 26(a)(1) INITIAL DISCLOSURES OF HONORSOCIETY.ORG, INC. AND HONOR SOCIETY FOUNDATION, INC.

Under Rule 26(a)(1) and Rule 26(e)(1) of the Federal Rules of Civil Procedure, HonorSociety.org Inc. and Honor Society Foundation, Inc. hereby make the following disclosures.

These disclosures represent HonorSociety's diligent and best efforts to respond at this time. They are based on HonorSociety's investigation to date, which is continuing. HonorSociety cannot exclude the possibility that continued investigation may reveal more complete information. HonorSociety reserves the right to make further supplemental and subsequent disclosures under Rule 26(e)(1) as information becomes available in the course of its investigation

and discovery. HonorSociety does not waive any evidentiary objections based upon relevance, materiality, competence, privilege, immunity from disclosure, trade secret, or any other grounds. All of the disclosures set forth below are made subject to the above limitations and qualifications.

## A.    Rule 26(a)(1)(A)(i) – Individuals likely to have discoverable information

The following individuals are likely to have discoverable information that HonorSociety may use to support its claims and defenses, unless solely for impeachment. The inclusion of an individual in the list below should not be construed in any way as waiving any attorney-client privilege or work-product protection associated with such individual.

1.    Michael Moradian, c/o Newman LLP, 100 Wilshire Blvd., Suite 700, Santa Monica, California 90401; (310) 359-8200. Mr. Moradian has knowledge of HonorSociety's CAREER EDGE Mark, its marketing materials, website, social media, regalia, and the general business and operations of HonorSociety, including accounting. Mr. Moradian also has knowledge of the defamatory statements made by PTK and Tincher-Ladner, as well as their tortious interference with HonorSociety's business relations, and false or misleading representations of facts concerning PTK's services. Mr. Moradian also has knowledge of HonorSociety's damages.

2.    Mikal Calvert, Operations Manager and Director of Marketing for HonorSociety, c/o Newman LLP, 100 Wilshire Blvd., Suite 700, Santa Monica, California 90401; (310) 359-8200. Mr. Calvert has knowledge of HonorSociety's operations and marketing.

3.    Nader Moradian, Administration, Human Resources and Accounting for HonorSociety, Mr. Moradian has knowledge of HonorSociety's administration, human resources and accounting.

4.    Tina Murtagh, former Publicity and Social Media for HonorSociety, c/o Newman LLP, 100 Wilshire Blvd., Suite 700, Santa Monica, California 90401; (310) 359-8200. Ms. Murtagh has knowledge of HonorSociety's publicity and social media.

5.    Burjiss Pavri, former employee, Programmer for HonorSociety, c/o Newman LLP, 100 Wilshire Blvd., Suite 700, Santa Monica, California 90401; (310) 359-8200. Mr. Pavri has knowledge of HonorSociety's programming.

6.      Ashleigh Finch, former employee, Office Manager and E-Commerce Manager for HonorSociety, 8822 Imperial Forest St., Las Vegas, NV 89139. Ms. Finch has knowledge of HonorSociety's office management and e-commerce.

7.      Shaday Pankey, former employee, Member Services for HonorSociety, 6748 Arctic Breeze St., Las Vegas, NV 89084. Ms. Pankey has knowledge of HonorSociety's programming.

8.      Monica Woodhams, former employee, Chapter Development and Services for HonorSociety, 1240 W. 57th Terr., Kansas City, MO 64113. Ms. Woodhams has knowledge of HonorSociety's chapter development and services.

9.      Mariah Allen, former employee, Chapter Development and Services for HonorSociety,3875 Cambridge St., #401, Las Vegas, NV 89119. Ms. Allen has knowledge of HonorSociety's chapter development and services.

10.     Alessandra Bifulco, former employee, Chapter Development and Services for HonorSociety, 3055 Errol Flynn St., #103, Las Vegas, NV 89122. Ms. Bifulco has knowledge of HonorSociety's chapter development and services.

11.     Nima Samadi, former employee, 457A Alvarado St., San Francisco, CA 94114. Samadi has knowledge relevant to HonorSociety's inception and launch, including HonorSociety's decision to adopt its corporate name, colors, and logo.

12.     Carolyn Asuncion, former employee, 952 Hudson Ave., Apt 8, Los Angeles, CA 90038. Asuncion has knowledge relevant to HonorSociety's inception and launch, including HonorSociety's decision to adopt its corporate name and logo.

13.     Susan Acheff, former Head of Product Management, 9 Canoa Hills Drive, Henderson, NV 89052. Acheff has relevant knowledge to HonorSociety's launch, marketing strategies, and related issues relevant to this matter.

14.     David Asari, c/o Newman LLP, 100 Wilshire Blvd., Suite 700, Santa Monica, California 90401; (310) 359-8200. Asari has knowledge of HonorSociety's inception and launch, including HonorSociety's decision to adopt its corporate name and logo, as well as certain of its business operations.

- 3 -

15.    Dr. Lynn Tincher-Ladner, President and CEO of Phi Theta Kappa Honor Society, may be contacted through counsel for PTK. Tincher-Ladner is believed to have knowledge of PTK's claimed trade dress and PTK EDGE Mark, as well as PTK's claims to secondary meaning, and PTK's claimed damages. Tincher-Ladner is also believed to have knowledge of the defamatory statements made by PTK and Tincher-Ladner, as well as their tortious interference with Honor Society's business relations, and false or misleading representations of facts concerning PTK's services.

16.    Frederick Lawrence, Secretary and CEO of Phi Beta Kappa, 1606 New Hampshire Avenue, NW, Washington, DC, 20009; (202) 265-3808. Lawrence is believed to have knowledge of honor societies' trade dress and history, as well as the negative impact on the honor-society space caused by PTK and other non-Phi Beta Kappa societies.

17.    Tara Singer, former Executive Director of Omicron Delta Kappa. (270) 791-5152. Singer is believed to have knowledge of honor societies' trade dress and history. Singer also wrote a dissertation on grade inflation (trends in grading at colleges and universities in attempts to relate grade inflation to student quality) and considers herself an authority in that field.

18.    Toni Marek. 411 Charleston Dr., Victoria TX 77904. Marek has information about PTK's anticompetitive conduct, promised benefits, student involvement, former executive director Rod Risley's sexual harassment and PTK's response re the same, and related issues.

19.    Rachel Reeck. (608) 633-9764. Reeck has information about former PTK executive director Rod Risley's sexual harassment and PTK's response re the same, and related issues.

20.    Antonio Villaraigosa, former Mayor of Los Angeles, speaker at HonorSociety Banquet. Villaraigosa is believed to have knowledge of HonorSociety's accessibility and inclusivity as well as HonorSociety member benefits.

21.    Stuart Rojstaczer, Publisher of GradeInflation.com. Rojstaczer is believed to have knowledge on trends in grading at colleges and universities and can speak to attempts to relate grade inflation to student quality.

22.    Rod Risley, former Executive Director of PTK. Risley is believed to have knowledge of PTK trade dress, culture, history, and anticompetitive conduct and intent to monopolize.

23.    Monica Marlowe, PTK Chief Marketing Officer. (601) 528-4975. Marlowe has knowledge of PTK's trade dress and Edge Mark, and marketing practices and representations.

24.    Fredrica Tyes, Chief Operating Officer, may be contacted through counsel for PTK. Tyes has knowledge of PTK's trade dress, webstore, and business practices.

25.    Dr. Nancy Sanchez, former Chief Operating Officer for PTK. (718) 909-9503. Sanchez has knowledge of branding efforts by PTK and honor societies generally.

26.    Dr. Blake Ellis, previously held multiple positions at PTK including Chief Engagement Officer, may be contacted through counsel for PTK. Ellis has knowledge of the market as related to honor societies as well as PTK's business operations.

27.    Kim Wooten, PTK Membership Special Projects Coordinator, may be contacted through counsel for PTK. Wooten may have knowledge of matters relevant to the claims at issue in this litigation.

28.    Heather Yush, PTK Senior Director of College Relations, may be contacted through counsel for PTK. Yush may have knowledge of matters relevant to the claims at issue in this litigation.

29.    Dr. George Boggs, Superintendent and President Emeritus of Palomar College, President and CEO Emeritus of the American Association of Community Colleges, and member of PTK Board of Directors, may be contacted through counsel for PTK. Dr. Boggs has knowledge of PTK's claims and presence in the community college space.

30.    Mary Linder, Texas Regional Coordinator of Grayson College and member of PTK Board of Directors, Grayson College, may be contacted through counsel for PTK. Linder has knowledge of PTK's presence in the community college space and of HonorSociety's activities on campus.

31.    Amanda Karpinski Gorman, Member of PTK Board of Directors, may be contacted through counsel for PTK. Gorman has knowledge of PTK's presence in the community college space.

32.    Dr. Dan Phelan, President of Jackson College and member of PTK Board of Directors, Jackson College, may be contacted through counsel for PTK. Phelan has knowledge of PTK's claims in this matter.

33.    Liam Blakeway, International President and member of the PTK Board of Directors, Lone Star College-Cyfair, may be contacted through counsel for PTK. Blakeway has knowledge of PTK's claims in this matter.

34.    Samantha Levy, current PTK Senior Director of Student Engagement, Division III, may be contacted through counsel for PTK.

35.    Justin Walley, current PTK Senior Accountant, Finance, may be contacted through counsel for PTK.

36.    Heather Johnson, current PTK Senior Director of Scholarship, may be contacted through counsel for PTK.

37.    Heather Yush, current PTK Senior Director of College Relations, may be contacted through counsel for PTK.

38.    Courtney Taylor, current PTK Senior Director of Development, may be contacted through counsel for PTK.

39.    Matthew Murphy, PTK Chief Information Officer, may be contacted through counsel for PTK. Murphy has knowledge about PTK's management, operations, business practices, domain-name registration and use, and related issues.

40.    Heather Allen, current PTK Executive Office Manager, may be contacted through counsel for PTK. Allen has information about PTK's management, operations, and other issues relating to PTK's claims.

41.    Courtney Lange, current PTK Senior Director of Special Initiatives, may be contacted through counsel for PTK.

42.     Wendy Flores (Giammarco), former PTK Senior Director of Events, c/o John Jones, Esq., Hickman Goza & Spragins PLLC, 1305 Madison Avenue, Oxford, MS 38655; (800) 441-1592. Flores has information about PTK's operations, management, market participation, purported benefits, and deceptive practices.

43.     Susan Booth, former PTK Conferences Services Administrator. Booth has knowledge about PTK's operations, management, market participation, purported benefits, and deceptive practices.

44.     Christin Grissom, former PTK Vice President of Scholarships, c/o Jeff Rimes, Taggart Rimes Attorneys, PLLC, 1022 Highland Colony Pkwy, Suite 101, Ridgeland, MS 39157. Grissom has knowledge about PTK's operations, management, market participation, purported benefits, and deceptive practices.

45.     Deborah Stamps, PTK Human Resources Coordinator. Stamps has knowledge about PTK's operations, management, and deceptive practices.

46.     Erin Cogswell, former PTK Interim Director of Marketing & Communications. Cogswell has knowledge about PTK's operations, management, market participation, and purported benefits.

47.     Rebecca Warren, former PTK Chief Experience Officer, c/o John Jones, Esq., Hickman Goza & Spragins PLLC, 1305 Madison Avenue, Oxford, MS 38655; (800) 441-1592. Warren has knowledge about PTK's operations, management, market participation, purported benefits, marketing, anticompetitive conduct, and Tincher-Ladner's extensive direct control and involvement in all aspects of PTK's business.

48.     Steve Mulhollen, former PTK Chief Financial Officer. (601) 672-9811. Mulhollen has knowledge about PTK's operations, management, finances, and former executive director Rod Risley.

49.     Cassie Bryant-Mendrop, former PTK Executive Assistant and Special Initiatives Coordinator; Director of Human Resources. (228) 324-2338. Mendrop has knowledge about PTK's operations, management, and related issues, and former executive director Rod Risley.

50.    Dawneen Banks, former PTK Associate Director of Regional and Chapter Development, Division IV. (720) 717-0771. Banks has knowledge about PTK's history, management, marketing claims, business strategy, relations with colleges, and former executive director Rod Risley.

51.    Rebekah Olson, former PTK Front-End Developer. (985) 290-6670. Olson has knowledge about PTK's marketing operations, email marketing practices, including with MailChimp, marketing claims, and purported benefits.

52.    Paige Still (Rakestraw), former PTK Engagement Consultant - Division III, may be contacted through counsel for PTK. Still has knowledge about PTK's operations, college relationships, anticompetitive conduct, and deceptive practices.

53.    Susan Scaggs, PTK Chief of Staff. Scaggs has knowledge about PTK's operations, management, and deceptive practices.

54.    Christopher Bingham, former PTK Lead Membership Support Specialist. Bingham has knowledge about PTK's operations, membership operations, marketing, purported benefits, and deceptive practices.

55.    Erica Bold, PTK Marketing Analyst. Bold has knowledge about PTK's membership operations, marketing, purported benefits, and deceptive practices.

56.    Victoria Alexander, former PTK Membership Support Specialist. Alexander has knowledge about PTK's membership operations, marketing, purported benefits, and customer service practices.

57.    Robin Lowe, former PTK chapter advisor. Lowe has knowledge about PTK's operations, finances, college relations, and her arrest and conviction for embezzlement.

58.    NeKeisha Johnson, former PTK Accounting Specialist. (601) 572-5951. Johnson has knowledge about PTK's operations, finances, and deceptive practices.

59.    Jessie Cameron-Chaney, former PTK Membership Support Specialist, c/o John Jones, Esq., Hickman Goza & Spragins PLLC, 1305 Madison Avenue, Oxford, MS 38655; (800)

- 8 -

441-1592. Chaney has knowledge about PTK's membership operations, marketing, purported benefits, customer service operations, false scholarship promises, and deceptive practices.

60.    Blake Ellis, former PTK Chief Engagement Officer. Ellis has knowledge about PTK's operations, management, relations with colleges, membership operations, marketing, and anticompetitive conduct.

61.    Vicky Embry, former PTK Supervisor, Financial Services. (601) 988-3859. Embry has knowledge about PTK's finances and operations.

62.    Aariel Charbonnet, PTK Associate Vice President, Membership Services. Charbonnet has knowledge about PTK's operations, management, relations with colleges, membership operations, marketing, and anticompetitive conduct.

63.    Anita Loflin, PTK Senior Director of Research & Effectiveness. Loflin has knowledge about PTK's marketing claims and the purported basis therefor, and deceptive practices.

64.    Paige Chandler, PTK Chief Financial Officer, may be contacted through counsel for PTK. Chandler has knowledge about PTK's operations, management, and finances.

65.    Association of College Honor Societies, Inc., including its officers, employees and records custodian, 2840 West Bay Dr., #141, Belleair Bluffs, FL 33770. ACHS is believed to have knowledge of collegiate honor societies, consumer perception of HonorSociety, and HonorSociety's activities and reputation on campuses.

66.    Batul Delal. (217) 791-0615. Delal has knowledge about communications with PTK regarding refund requests and other customer service issues, as well as perception of PTK and HonorSociety both during and after attending community college.

67.    Mason Simmons. Simmons has knowledge about communications with PTK regarding refund requests and other customer service issues, as well as perception of PTK and HonorSociety both during and after attending community college.

68.    Mara Ettlinger. Ettlinger has knowledge about HonorSociety branding and website design.

69.    Len Fainer. Fainer has knowledge about the user-experience (UX) redesign of the HonorSociety website.

70.    Genevieve Foley. (503) 791-5152. Foley has knowledge of PTK's college and student relations and deceptive practices.

71.    All persons listed/identified by PTK and/or Tincher-Ladner either in their initial disclosures or any supplementation or amendment of them, their interrogatory answers or any supplementation or amendment of them, and any documents produced by either in the course of this litigation.

72.    All persons listed/identified by HonorSociety.org, Inc. and/or Honor Society Foundation, Inc. either in their initial disclosures or any supplementation or amendment of them, their interrogatory answers or any supplementation or amendment of them, and any documents produced by either in the course of this litigation.

73.    Any person deposed in this matter.

HonorSociety reserves the right to supplement this disclosure under Rule 26(e). In addition to the above-listed individuals, HonorSociety reserves the right to rely upon the testimony of additional witnesses as may be identified in the course of further discovery and investigation, including but not limited to persons disclosed by PTK or Tincher-Ladner.


**B.    Rule 26(a)(1)(A)(ii) – Documents**

HonorSociety identifies the documents listed below as those it may use at trial, based on the information currently available to HonorSociety and subject to additional information provided during discovery or uncovered during any further investigation:

1.    Documents reflecting PTK and HonorSociety's commercial uses of their respective trademarks and trade dress.

2.    Documents reflecting the goods and services that PTK and HonorSociety make and/or offer to consumers in connection with their respective trademarks and/or trade dress.

3.    Visual representations of the goods and services that PTK and HonorSociety offer to consumers in connection with their respective trademarks and/or trade dress.

4.    Documents reflecting the date of first commercial use by PTK and HonorSociety of their respect trademarks and/or trade dress.

5.    Documents reflecting the revenues generated by PTK and HonorSociety from sales of their respective goods and services offered to consumers in connection with their trademarks and/or trade dress.

6.    Documents showing the distribution channels for PTK and HonorSociety's goods and services offered to consumers in connection with their respective trademarks and/or trade dress.

7.    Documents showing the advertising, marketing and sales of the goods and services that PTK and HonorSociety offer to consumers in connection with their respective trademarks and/or trade dress.

8.    Documents showing the amount, volume, and geographic extent of the sales of goods and services offered to consumers by PTK and HonorSociety in connection with their respective trademarks and/or trade dress.

9.    Documents reflecting the commercial and conceptual strength of PTK and HonorSociety's respective trademarks and/or trade dress.

10.    Documents supporting PTK's claims of consumer confusion.

11.    Documents supporting PTK's claims that the infringements of its trademarks and/or trade dress by HonorSociety were "willful."

12.    Corporate business records of Plaintiff and HonorSociety, including financial records.

13.    Documents substantiating PTK and HonorSociety's respective claimed damages.

14.    Documents supporting HonorSociety's counterclaims and third-party claims.

15.    Documents reflecting that statements made by PTK and/or Tincher-Ladner about HonorSociety are false.

16.    Documents reflecting that the false statements made by PTK and/or Tincher-Ladner about HonorSociety were published by PTK and/or Tincher-Ladner.

17.    Documents reflecting that false statements published by PTK and/or Tincher-Ladner about HonorSociety were made with malice.

18.    Documents reflecting that PTK and/or Tincher-Ladner has referred to HonorSociety as a "scam," or has made other similar accusations about HonorSociety.

19.    Documents reflecting that statements made by PTK and/or Tincher-Ladner about HonorSociety have been repeated by third parties.

20.    Documents reflecting that PTK and/or Tincher-Ladner have encouraged third parties to complain to their State Attorneys General and the Better Business Bureau about HonorSociety.

21.    Documents reflecting that PTK and/or Tincher-Ladner's statements about HonorSociety have caused it to suffer damages and/or have cause PTK to experience an increase in its revenues.

22.    Documents reflecting that PTK and/or Tincher-Ladner have tortiously interfered with HonorSociety's business relations.

23.    Documents reflecting that PTK and/or Tincher-Ladner have made false or misleading representations of fact to schools, groups and consumers concerning PTK's goods and services, including but not limited representations that PTK is the "only and/or is the "official" honor society for two-year colleges.

24.    Documents relating to the financial and commercial effects of PTK's anticompetive conduct, policies, and practices.

25.    Documents reflecting that PTK and/or Tincher-Ladner's false or misleading statements concerning PTK's goods and services have caused damages to HonorSociety.

26.    Documents supporting PTK and Tincher-Ladner's respective defenses to HonorSociety's counterclaims and third-party claims.

27.    Any document produced by the parties in discovery, or that are introduced at the trial of this matter.

HonorSociety reserves the right to supplement this disclosure under Rule 26(e), and its identification of documents does not waive any privilege that may apply to those documents, or any objections which would make the documents otherwise non-discoverable. HonorSociety makes this disclosure without waiving any objections as to the discoverability, access to, or use, of any particular documents or electronically-stored information or categories of documents or electronically-stored information.

## C.    Rule 26(a)(1)(A)(iii) – Damages

HonorSociety is seeking recovery of its actual damages and disgorgement of PTK and Tincher-Ladner's profits, which HonorSociety believes are no less than $1 million, but which will be determined according to proof at trial.

HonorSociety is seeking: an award of damages under 15 U.S.C. § 15 adequate to compensate it for the injury caused by PTK's unlawful conduct as alleged; treble damages under 15 U.S.C. § 15; prejudgment interest under 15 U.S.C. § 15; and an award of HonorSociety's costs and reasonable attorneys' fees under 15 U.S.C. § 15.

Additionally, HonorSociety is seeking injunctive relief, punitive damages, treble actual damages, and recovery of its attorneys' fees and costs. HonorSociety's attorneys' fees and costs will be based upon HonorSociety's billing statements from its attorneys.

## D.    Rule 26(a)(1)(A)(iv) – Insurance

HonorSociety has not identified an agreement satisfying the conditions set forth in Rule 26(a)(1)(A)(iv).

Dated: December 13, 2024                    NEWMAN LLP

                                            s/ Derek Linke
                                            Derek A. Newman (pro hac vice)

- 13 -

Derek Linke (pro hac vice)
Keith P. Scully (pro hac vice)
Gregory M. Scialabba (pro hac vice)
100 Wilshire Blvd, Suite 700
Santa Monica, CA 90401
Tel: (310) 359-8200
dn@newmanlaw.com
linke@newmanlaw.com
keith@newmanlaw.com
gs@newmanlaw.com

Attorneys for Defendant, Counter-Claimant,
and Third-Party Plaintiff HonorSociety.org, Inc.
and Honor Society Foundation, Inc.

## Certificate of Service

I hereby certify that on December 13, 2024, a copy of the foregoing was served via email upon the following counsel for Plaintiff and Counter-Defendant Phi Theta Kappa Honor Society, and Third-Party Defendant Dr. Lynn Tincher-Ladner.

Michael B. Wallace, MSB # 6904
Charles E. Cowan, MSB #104478
Beau M. Bettiga, MSB #105905
Jack F. Hall, MSB #106482
WISE CARTER CHILD & CARAWAY
401 East Capitol Street, Suite 600
P. O. Box 651 (39205-0651)
Jackson, MS 39201
(601) 968-5500 - phone
mbw@wisecarter.com
cec@wisecarter.com
ksh@wisecarter.com
bmb@wisecarter.com
jfh@wisecarter.com

Jonathan G. Polak (Pro Hac Vice)
William M. Etienne (Pro Hac Vice)
Daniel R. Warncke (Pro Hac Vice)
TAFT STETTINIUS & HOLLISTER LLP
One Indiana Square, Suite 3500 Indianapolis,
IN 46204-2023
(317) 713-3500 – phone
(317) 713-3699 – fax
jpolak@taftlaw.com
metienne@taftlaw.com
warncke@taftlaw.com

Rachel Smoot (Pro Hac Vice)
TAFT STETTINIUS & HOLLISTER LLP
41 S. High Street, Suite 1800
Columbus, OH 43215
(614) 221-2838 – phone
(614) 221-2007 – fax
rsmoot@taftlaw.com

Philip R. Bautista (Pro Hac Vice)
TAFT STETTINIUS & HOLLISTER LLP
200 Public Square, Suite 3500
Cleveland, OH 44114
(216) 241-2838 – phone
(216) 241-3707 – fax
pbautista@taftlaw.com

I hereby certify under the penalty of perjury that the foregoing is true and correct.

Executed on December 13, 2024 at Mercer Island, Washington.

s/ Derek Linke
Derek Linke

# EXHIBIT A-3

## CAUSE NO. 3:22-CV-00208-CWR-RPM

| | | |
|---|---|---|
| PHI THETA KAPPA HONOR SOCIETY | § | UNITED STATES DISTRICT COURT |
| | § | |
| Plaintiffs, | § | |
| VS. | § | FOR THE |
| | § | |
| HORONSOCIETY ORG INC | § | |
| Defendant. | § | SOUTHERN DISTRICT OF OF MISSISSIPPI |

## RETURN OF SERVICE IN SUPPORT OF SUBSTITUTE SERVICE
### TONI MAREK

"The following came to hand on **Oct 22, 2024, 7:04 pm,**

**SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION, ,**

For delivery to **TONI MAREK**

1) Unsuccessful Attempt: Oct 24, 2024, 9:08 pm CDT at HOME: 411 CHARLESTON DRIVE, VICTORIA, TX 77904

No answer at this time. Lights are on inside. Subject is the registered owner of this location. 3 vehicles in the driveway license plate #tdw8010 which is registered to BLAKE C MAREK (Male) . #fjz6906 which is registered to KENNETH LOREY FREED (Male) . #sjj6594 which is registered to TONI ANNE MAREK (Female)

2) Unsuccessful Attempt: Oct 25, 2024, 12:10 pm CDT at HOME: 411 CHARLESTON DRIVE, VICTORIA, TX 77904

No answer at this time. Same vehicle present from previous attempts. There is a FedEx package at the door with the name Kenneth Freed on it.

3) Unsuccessful Attempt: Nov 1, 2024, 2:45 pm CDT at HOME: 411 CHARLESTON DRIVE, VICTORIA, TX 77904

The client requested service to be put on hold.

4) Unsuccessful Attempt: Nov 4, 2024, 9:17 pm CST at HOME: 411 CHARLESTON DRIVE, VICTORIA, TX 77904

No answer at this time. Same vehicle present from previous attempts. Lights are on inside.

5) Unsuccessful Attempt: Nov 11, 2024, 1:01 pm CST at HOME: 411 CHARLESTON DRIVE, VICTORIA, TX 77904

No answer at this time. Same vehicle present from previous attempts.

I have made diligent efforts to deliver said papers to **TONI MAREK**. I have made numerous attempts at their residence address as described above. I believe an efficient way to effect service is by leaving a copy with anyone over 16 years of age or by securely attaching the Citation, with Plaintiff's Original Petition attached, with tape to the front door of **TONI MAREK's** residence, where it is sure to be seen by someone at the residence, or in any other manner the affidavit or evidence before the court shows will be reasonably effective to give the defendant notice of the suit.

I am a person over eighteen (18) years of age and I am competent to make this affidavit. I am a resident of the State of Texas. I am familiar with the Texas Rules of Civil Procedure as they apply to service of Process. I am not a party to this suit nor related or affiliated with any herein, and have no interest in the outcome of the suit. I have never been

convicted of a felony or of a misdemeanor involving moral turpitude. I have personal knowledge of the facts stated herein and they are true and correct."

My name is **Eric Enim**, my date of birth is **08/05/1986**, and my address is **4801 Everhart Rd Unit 6901, Corpus Christi, TX 78411.** I declare under penalty of perjury that the foregoing is true and correct.

Executed in **NUECES** County, State of **TEXAS**, on **November 13, 2024.**

_Eric Enim_

**Eric Enim**
**Certification Number: PSC-4903**
**Certification Expiration: 04/30/2026**

# EXHIBIT A-4

## Smoot, Rachel A.

| | |
|---|---|
| **From:** | Polak, Jonathan |
| **Sent:** | Tuesday, October 29, 2024 12:32 PM |
| **To:** | admin@tonimarek.com |
| **Cc:** | Smoot, Rachel A.; Etienne, Mike |
| **Subject:** | Subpoena |
| **Attachments:** | 2024-10-21 T. Marek Subpoena Packet.pdf |

Ms. Marek,

Although we have not met, I believe you are likely aware of both my firm and me due to your involvement in the litigation between Phi Theta Kappa Honor Society and Honorsociety.org, Inc.

We issued a subpoena in that litigation to compel your attendance at a deposition and for the production of documents. I attach that subpoena for your review. Since issuing it, we have tried repeatedly to serve this subpoena on you. The reports I have received from the process server indicate that although the lights are on at the residence we understand to be your home, and it appears that persons are inside, no one is coming to the door to receive the subpoena.

It may be that you did not hear the process server knocking/ringing the doorbell. I write to let you know that we are actively attempted to secure service of the subpoena. And by this email you are on notice of those efforts.

The deposition is currently scheduled for **Monday, November 4, 2024, in Victoria, Texas**, where I understand you to live. I am flexible on moving that date to a time that accommodates your schedule, provided we work together to schedule it at a mutually agreeable date, time and place. There is also the issue of the documents that we need produced in advance of the deposition.

I can be reached at this email, or at 317-713-3532, to discuss these issues. Otherwise, we will continue our efforts to serve you with the subpoena. I look forward to hearing from you.

**Taft**

**Jonathan G. Polak,** Partner
Intellectual Property/Patent
Direct: 317.713.3532 | Office Ext: 63532
Taft Office: Indianapolis

**Taft /** SH

Taft expands on Jan. 1, 2025 to the Mountain West region with the addition of Sherman & Howard, a prominent 130-year-old law firm. Learn more **here.**

1

# EXHIBIT A-5

## VICTORIA COUNTY SHERIFF
# JUSTIN MARR

**101 N. GLASS ST. · VICTORIA, TX · PH: 361-575-0651 · FAX 361-574-8019**

### <u>AFFIDAVIT OF ATTEMPTED SERVICE</u>

The State of Texas
County of Victoria

    BEFORE ME, THE undersigned authority on this day personally appeared the Affiant, known to me to be a person of credible age and says as follows:

    "I am Deputy Jason Carroll, employed by Justin Marr, Sheriff of Victoria County, Texas.  I am assigned to the Civil Unit and was unable to locate the Defendant, <u>**Toni Marek**</u> named in **Cause # 3:22cv-00208**, at the address given, 411 Charleston Drive, Victoria, TX, in Victoria County, Texas.

On 11-15-24 at approximately 10:02 AM, No Contact, Left Hanger. Called phone number and left voicemail.

On 11-18-24 at approximately 11:11 AM No Contact, Left Hanger. Called phone number and left voicemail.

On 11-19-24 at approximately 09:30 AM No Contact, Left Hanger. Called phone number and left voicemail.

On 11-21-24 at approximately 10:51 AM No Contact, Left Hanger. Called phone number and left voicemail.

On 11-26-24 Sent Letter to 411 Charleston.

We were unable to locate any other addresses or phone numbers to attempt in Victoria County.

Defendants Name: **Toni Marek**
Reason for non-service: **Avoiding service.**

                          FURTHER SAITH AFFIANT NOT.

                          Deputy Jason Carroll
                          Victoria County Sheriff's Office

        SWORN TO AND SUBSCRIBED before me, this **27th** day of November, <u>2024</u>.  TO CERTIFY WHICH WITNESS MY HAND AND SEAL OF OFFICE.

                          Sgt. M. Valdez #210

**Deputy Jason Carroll, a licensed Texas Peace Officer acting in official capacity.**



**VICTORIA COUNTY SHERIFF**
**JUSTIN MARR**
101 N. GLASS ST. · VICTORIA, TX · PH: 361-575-0651 · FAX 361-574-8019

# OFFICIAL CIVIL RECEIPT
## Victoria, Texas

Receipt No.: <u>2024 –150</u>

Date: <u>11-14-2024</u>

Received in Cause No.: <u>3:22cv-00208</u>

Plaintiff: <u>Phi Theta Kappa Honor Society</u>

Defendant: <u>Honorsociety.org, Inc</u>

Paid By: <u>Rachel A. Smoot</u>

Amount: <u>$100.00</u>

Memo: <u>Sheriff's Fee</u>

<u>Transaction Type</u>
☒ Sheriffs Service Fee
☐ Tax Sale Purchase
☐ Writ of Exec Payment
☐ Estray

<u>Payment Type</u>
☒ Business Check <u># 140</u>
☐ Cashier's Check #:
☐ Money Order #

JUSTIN MARR, Sheriff
Victoria County, Texas

By:_____

# EXHIBIT A-6



706 Pro-Med Lane, Suite 200A, Carmel, IN 46032                    (317) 564-8383 service@veracityiir.com
Website:  www.veracityiir.com                                                                    IN PI#: 21800012

## Investigative Report

**RE: PHI THETA KAPPA HONOR SOCIETY vs. HONORSOCIETY.ORG, INC
SUBJECT: SUBPOENAS TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION**

### **November 25, 2024:**

Douglas Crumly was sub-contracted by Doug Kouns of Veracity IIR to serve two subpoenas: 1) a Subpoena Duces Tecum on Toni Marek, and 2) a Subpoena to appear for Deposition on Toni Marek. He arrived at 411 Charleston Dr, Victoria, Texas 77904, at approximately 5:45 pm. Crumly observed four vehicles in the driveway: two black Ford F150 pickups, a 2008 Ford Mustang with TX license plate TDW 8250 registered to Toni Marek, and a silver Ford Mustang with TX license plate TWD 8010 parked in front of the residence.

Crumly rang the Ring Camera doorbell, but there was no answer. Observing people through the windows, he knocked on the front door and returned to the window, where he noticed a person sitting on a bed. That individual was startled but ignored his presence.

Crumly then approached both neighbors, introduced himself, and inquired if they knew Toni Marek. Both neighbors confirmed they knew her and acknowledged that the vehicle registered to Toni was typically the one she drove. He also asked the neighbors if they knew where she might work. After gathering this information, he returned to Marek's residence and asked through the Ring doorbell for her to come to the door to speak.

Having been unsuccessful thus far, he contacted the Victoria Police Department and identified himself to two officers who arrived at the scene. Crumly explained the situation, and the officers attempted to contact Toni Marek by knocking on the door and using the Ring Camera device. Their dispatcher also tried reaching out by phone, but to no avail; the officers noted that they could



Investigative Report: Marek Service                                                        Page | 1



| | |
|---|---|
| 706 Pro-Med Lane, Suite 200A, Carmel, IN 46032 | (317) 564-8383 service@veracityiir.com |
| Website: www.veracityiir.com | IN PI#: 21800012 |

only see inside once the lights in the house are turned off. The officers suggested he might want to return another day to see if he could catch her at the residence. Crumly then left the area and returned to his office.

**November 27, 2024:**

Crumly returned to 411 Charleston Dr, Victoria, Texas 77904, at approximately 6:30 am. He noticed that Toni Marek's vehicle was absent, but the other three cars remained at the residence. He parked down the street to monitor any activity from the house. The back side of the residence overlooked the fairway of the nearby golf course. Crumly walked around the back of the house, where he could see the porch, but all windows and blinds were closed with no visible movement.

He spoke with a neighbor who said they rarely saw those vehicles leave. Around 8:40 am, he observed a male subject exit in one of the black F150 pickups. Shortly after, a female and male got into another black F150 pickup with TX Plate SJJ 6594. Crumly pulled up to the residence and called out Toni Marek's name. Startled, she jumped into the truck, locked the doors, and sped away as he approached to serve her the subpoenas. Crumly attempted to throw the documents into the pickup's bed, but they hit the tailgate and fell out as she drove off. He followed her through the residential streets as she made several aggressive turns to evade him. When stopped at a red light twice, Crumly exited his vehicle and approached her at the driver's side window. Marek would not roll down the window or make eye contact with him. She eventually did an illegal U-turn and sped away exceeding the speed limit. After consulting with Investigator Kouns, Crumly decided to disengage.

**December 12, 2024:**

Crumly returned to 411 Charleston Dr., Victoria, Texas 77904, to make another attempt to serve a Subpoena for Deposition. He positioned himself down the street to observe any activity at the residence. The only vehicle missing at that time was Toni Marek's Ford Mustang. He rang the Ring Doorbell again, stating





706 Pro-Med Lane, Suite 200A, Carmel, IN 46032          (317) 564-8383 service@veracityiir.com
Website: www.veracityiir.com                                              IN PI#: 21800012

that he had a federal subpoena for Toni Marek, but there was no response despite seeing people inside.

Crumly then called Victoria Constable Precinct 4, Aaron Burleson, to inform him of the situation. Upon arrival, Constable Burleson went to the residence, rang the Ring doorbell, identified himself in uniform, banged on the window, and instructed them to come to the front door. He noted that he could see people sitting on the couch, ignoring him. The Constable ran the license plates of the remaining vehicles and discovered that two of them had expired license tags.

Crumly conferred with Investigator Kouns, who requested that the subpoena be posted on the front door or served to anyone over 18. Crumly posted the document and the witness fee on the front door and took pictures, which were sent to Kouns. He remained in the area for several hours, hoping to observe if someone would retrieve the documents from the door.

Constable Burleson recorded a statement detailing his efforts for Kouns. He contacted Crumly several times after the subpoena was posted to keep him informed about whether the documents had been removed. Eventually, Crumly was notified that the documents had been taken, and he informed Mr. Kouns.

Respectfully,

Douglas Crumly, TBCI
D.C. Investigations
P.O. Box 38
Chapman, Ranch, Texas 78347-0038
TX. DPS PSB Lic. # A09770
JBCC# PSC-3565
361-947-0351 (Bus. Cell)
dcinvestigationscc@yahoo.com









# EXHIBIT A-7

**JONATHAN G. POLAK**
317.713.3532
JPolak@taftlaw.com

December 4, 2024

**Via Email:** admin@tonimarek@marek.com; AndThenSheSpokeUp@gmail.com

Toni Marek

 Re: *Phi Theta Kappa Honor Society, et al. v. HonorSociety.Org., et al.*

Ms. Marek,

 Our firm has been attempting to serve you with subpoenas for documents and testimony for over a month. This should be no surprise to you as you have willingly inserted yourself in this case, including but not limited to providing a Declaration on behalf of Honor Society, providing documents (without a subpoena) to Honor Society that have been produced in this case, submitting complaints to states attorney generals parroting Honor Society's allegations in this case, and submitting FOIA requests to community colleges that parrot those that Honor Society has issued to tax an already burdened research.

 We have recently become aware that in an attempt to avoid service of process, you physically evaded the process server, jumping back into your vehicle, driving in circles around the area, and refusing to respond to the server when he was standing outside your vehicle window. Our process server was forced to stop following you after you made an illegal U-turn and sped away recklessly. If needed, our process server will execute an affidavit attesting to these facts, along with photos taken of your vehicle during the process.

 These intentionally evasive maneuvers are in violation of Texas Penal Code § 38.16 and qualify as a Class C misdemeanor. That code section provides that a "person commits an offense if he intentionally or knowingly by words *or physical action* prevents execution of any process in a civil cause." TEX.PEN.CODE § 38.16 (emphasis added). To that end, we require an immediate response to our subpoena, including the production of the requested documents and your availability for an in-person deposition. I attach a copy of that subpoena hereto for your review.

 Had we served you weeks ago when we started this process we could have been more flexible on the date(s) for your deposition, as well as the return date for the production of documents. However, the discovery deadline in this case is December 19th, leaving us with fewer options on that schedule. Regardless, we can include a discussion around these issues when/if you contact us today.

Toni Marek
December 4, 2024
Page 2


     If we do not receive a response from you by 5PM CT today acknowledging receipt of this subpoena and your intention to abide by it, we will have no choice but to contact your local prosecutor and bring this matter to her attention.

     I am available at 317-713-3532.  You can also speak with my colleague, Rachel Smoot, 614-220-0222.

Sincerely yours,



Jonathan G. Polak

JGP/RAS/dac
Encl.

# EXHIBIT 4

 Gmail

Toni Marek <tonimarek@gmail.com>

**RE: Urgent: PTK Board of Directors Open Letter and Evidence Regarding PTK Leadership and Governance**
1 message

Polak, Jonathan <JPolak@taftlaw.com>                                                                                    Wed, Feb 5, 2025 at 7:51 PM
To: Toni Marek <tonimarek@gmail.com>
Cc: "Smoot, Rachel A." <RSmoot@taftlaw.com>, "Etienne, Mike" <METienne@taftlaw.com>

Ms. Marek,

Your continued efforts at contacting the Board and various other organizations are at odds with your position on the subpoena we served on you. I would think that if you truly wanted to "be heard", you would not evade service of the subpoena to take your deposition where you could explain to us, under oath, facts known to you on these issues raised in your communications.

With that in mind, we are going to be filing in the Southern District of Texas a motion to enforce the subpoena against you, or in the alternative to secure alternative service since serving the summons in the ordinary course was unsuccessful due to your evasion. I would prefer to not spend PTK's resources in filing that motion, and it can be avoided if you would simply agree to appear under the subpoena at a date and time we agree upon, and to otherwise produce the records that we are seeking. This process is for not only PTK's protection, but for your own as well, since under this process the rules are well-established and there is a judicial authority we can both seek the guidance of if we should run into any issues.

If you are not agreeable to this, please state so and we will move forward with filing our motion. If you are agreeable to it, or at least open to a discussion around it, please let me know and we can schedule a call between the two of us to discuss logistics. If I do not hear from you by Friday, February 7, then I will assume that you reject my proposal and I will move forward with my judicial filing. We reserve the right to seek our reasonable attorneys' fees incurred in connection with that action from you.

Taft/

Jonathan G. Polak
Partner
JPolak@taftlaw.com
Dir: 317.713.3532
Tel: 317.713.3500  |  Fax: 317.713.3699
One Indiana Square, Suite 3500
Indianapolis, Indiana 46204-2023

taftlaw.com

Taft/ | Sherman &Howard

Taft has expanded to the Mountain West region with the addition of Sherman & Howard, a prominent 130-year-old law firm. Now over 1,000 attorneys strong. Learn more here.

This message may contain confidential privileged, attorney work product or otherwise confidential. If you are not an intended recipient, use and disclosure of this transmission are prohibited. If you received this transmission in error, please notify the sender by reply e-mail and delete the message and any attachments.

From: Toni Marek <tonimarek@gmail.com>
Sent: Friday, January 31, 2025 4:30 PM
To: gboggn@palomar.edu; dphelan@iccmi.edu; lindenm@grayson.edu; modu@sdccd.edu; alahmartala@gmail.com
Cc: Polak, Jonathan <JPolak@taftlaw.com>
Subject: Re: Urgent: PTK Board of Directors Open Letter and Evidence Regarding PTK Leadership and Governance

PTK Board and Mr. Polak,

Thank you for your correspondence, Mr. Polak. I would like to address several key matters in response.

First, it is both hurtful and counterproductive for PTK to have ignored these concerns for nearly a decade and now attempt to address them solely through legal threats. I have made longstanding efforts to engage in direct communication with PTK leadership since 2015, as evidenced by the email below from that time. PTK, as a nonprofit, should serve its members and stakeholders by addressing legitimate concerns rather than attempting to silence them. My continued request is simple: I want to be heard and to engage in a direct and meaningful conversation with the PTK Board.

Second, I want to clarify that I am in the process of writing a book titled "Saving PTK" which aims to shed light on critical issues within Phi Theta Kappa that many believe require urgent attention and reform. The book is intended to be a free resource to raise awareness and foster necessary discussions. I assume you may already be aware of the press release announcing the book, but for reference, it can be found here:
https://www.prnewswire.com/news-releases/phi-theta-kappa-expose-new-book-saving-ptk-exposes-toxic-systemic-issues-within-phi-theta-kappa-302363756.html

Third, I require explicit clarification regarding the scope of your representation. Are you representing PTK as an entity, its board of directors, or Dr. Lynn Tincher-Ladner? This is a crucial distinction, as I will not consent to discussions where a conflict of interest may exist. Transparency is necessary for any engagement to be productive and legally appropriate.

Fourth, I remain open to correcting any objectively false statements, should any be identified. However, to my knowledge, I have not made any factually incorrect claims. I reserve my right to express opinions, present subjective viewpoints, and highlight arguable matters of public concern. My efforts are aligned with the best interests of PTK, its members, and the broader public. It is important to note that I have already engaged with nonprofit advocacy organizations that support free speech rights and will continue to ensure that my ability to speak on these matters is protected.

Finally, as a legal professional, I am sure you are aware of the "Streisand Effect"—the phenomenon where attempts to suppress information only amplify public interest in the subject. I want to ensure that the PTK Board is fully informed of this principle. Any legal action against me, including cease-and-desist attempts or lawsuits, will only serve to magnify the issues being raised regarding PTK and intensify public and media scrutiny. Such actions are not in the best interests of PTK or its Board and would only escalate attention to the very issues of concern surrounding PTK.

That said, my preference remains to resolve these matters proactively in a way that serves the public interest—just as I broadly requested in my email over a decade ago. If PTK is willing to engage in good faith discussions where my concerns are meaningfully acknowledged and addressed, I am open to such dialogue. Please let me know how you wish to proceed.

Respectfully,
Toni Marek

*My email for a meeting to PTK Leader Tincher-Ladner in 2015:*

 Gmail

Toni Marek <tonimarek@gmail.com>

---

**Request for a meeting**
_____

Toni Marek <tonimarek@gmail.com>                                    Wed, Aug 5, 2015 at 5:47 PM
To: tincheln@ptk.org, lynn.tincher-ladner@ptk.org
Cc: Rachel Reeck <rachelreeck@gmail.com>, Toni Marek <tonimarek@gmail.com>


Dear Dr. Tincher-Ladner,


We wanted to reach out to you today because we feel a meeting with you and/or representatives of Phi Theta Kappa would be prudent given the current state of the incomplete investigation.


Mr. Siler informed us, on July 13, the Board of Directors made the decision to terminate the investigation into our allegations, without seeing any evidence gathered and without coming to a conclusion. We do not agree with the Board of Director's decision to cease the investigation just because Dr. Rod Risley made the choice to leave the organization.


We are also disappointed in the Board of Director's decision to deny a meeting with us, as relayed by Mr. Siler on July 14. It is because of this we request a meeting to discuss this decision and events that have transpired over the last 15 months.


There are still many lingering issues, which demand a resolution, and we sincerely hope you will meet with us to discuss the steps we, and Phi Theta Kappa, plan to take moving forward. We believe this meeting would be in the best interest of everyone involved, emotionally and financially.


Thank you for your time in reading this correspondence.


Sincerely,


Rachel Reeck and Toni Marek

---

On Mon, Jan 27, 2025 at 10:55AM Toni Marek <tonimarek@gmail.com> wrote:

Phi Theta Kappa Board of Directors,

I again write this letter with a sense of urgency. Meaningful acknowledgment from the Board remains absent. Your silence, in the face of troubling allegations and firsthand testimonies, is not acceptable for an organization entrusted with a mission to serve students and uphold the public good.

I must clarify that I am not part of any lawsuit with PTK, nor do I seek to harm this organization. My sole purpose is to ensure Phi Theta Kappa operates ethically, transparently, and in the best interests of its members and the broader community. Yet, I believe the attorney currently speaking on PTK's behalf is, in my opinion, misleading the Board about the gravity of these concerns and the leadership issues at hand. As Board members, it is your fiduciary duty to independently verify the facts rather than rely on advice that may be colored by conflicting interests.

**1. Save Phi Theta Kappa Change.org Petition**

I urge you to review the petition at change.org/savephithetakappa. This campaign details the experiences of multiple individuals, including my own, who believe that PTK's current practices are harmful to students, employees, and the broader public trust. I invite you, as Board members, to engage directly with the public by posting your perspective on the petition page. Open dialogue is the best antidote to the appearance of secrecy and inaction.

**2. The "Top 10%" Claims and Grayson College Data**

The petition highlights the troubling misuse of the "Top 10%" distinction. In one example, public records from Board Member Mary Linder's own institution, Grayson College, show that 39% of students qualified for PTK membership under the claim of being in the "Top 10%." This mismatch suggests that the marketing narrative is mathematically impossible—or, at minimum, highly misleading. While the Board's attorney may offer lengthy rationalizations, ask yourselves how this appears to a student who receives a recruitment email touting exclusivity when nearly 40% of their classmates receive the same invitation.

**3. Balancing Legal Rationalizations with Plain Truth**

I understand the Board may have received a long legal write-up defending these practices. However, the crux of the issue remains: students believe they are in a top-tier group when, in fact, the data show far broader invitations. The difference between "top 10%" claims and the reality of 39% (or more) can be perceived as misleading at best, and may severely undermine the trust that students, donors, and the public place in PTK.

**4. Ex-Employees' Testimonies: Wendy, Jessica, and Rebekah**

Crucially, I direct your attention to the comments posted by three former PTK employees: Wendy, Jessica, and Rebekah. Their statements (available in full on the petition page) describe a toxic workplace culture, including allegations of bullying, retaliation, and broken promises—accounts that deeply contradict the organizational values PTK purports to uphold. If these employees' experiences are even partially accurate, the organization's leadership problems extend beyond misleading marketing and into issues of workplace integrity and staff well-being.

1. **Wendy's Experience:** Over 25 years with PTK, witnessing a toxic environment and alleged bullying so severe she left without notice, describing lingering PTSD from the abuse.
2. **Jessica's Experience:** A rescinded scholarship promised by PTK leadership and a lack of response from upper management. She also raises concerns about family hires and salaries, suggesting money is funneled to those at the top rather than truly helping members.
3. **Rebekah's Experience:** Feeling misled as a student and later observing bait-and-switch tactics as an employee. She describes a culture of fear and an "inner circle" insulated from scrutiny, ultimately undermining PTK's mission.

These accounts are not frivolous complaints; they point to systemic issues that warrant immediate Board attention. Silence on these matters appears complicit, particularly when they involve credible allegations from former insiders.

**5. A Call for Accountability and Transparency**

I remind you, Board members, of your fiduciary responsibility: to protect PTK's mission and act in the best interests of its students, members, and the public. Open, honest communication about these concerns is paramount. The conflict-ridden attorney response you've received is no substitute for a thorough, independent investigation. Nor does it relieve you of the responsibility to address these claims head-on.

- **Acknowledge the Petition:** Engage with the comments and concerns raised; your silence alienates current and former members who have come forward in good faith.
- **Weigh the "Legalese" vs. Reality:** Ask yourselves how the "Top 10%" messaging and scholarship figures appear to a typical community college student.
- **Ensure Independent Oversight:** If the same attorney is representing PTK leadership personally, that raises ethical red flags. Revisit whether separate counsel is needed.

I write this in good faith, not out of malice or personal gain. I am not involved in any lawsuit against PTK. My only aim is to safeguard the organization's future by spotlighting issues that threaten its credibility and mission. Silence at this stage—from either the Board or any counsel who might be serving conflicting interests—does a disservice to everyone who believes in PTK's founding ideals.

Thank you for your time, and I strongly urge you to respond substantively rather than rely on the same counsel who, in my opinion, is not forthright about the severity of these concerns. The public, donors, and—most of all—students are looking to you for real leadership.

Sincerely,

Toni Marek
PTK Lifetime Member & Former International Officer
This letter reflects my personal perspectives and does not represent PTK's official stance. I am not a lawyer, and my statements do not constitute legal advice.

---

On Thu, Jan 23, 2025 at 11:55AM Toni Marek <tonimarek@gmail.com> wrote:

Dear PTK Board of Directors,

It has been more than a week since I first raised urgent concerns about PTK's direction, only to be met with silence. This lack of response is deeply troubling, given your fiduciary responsibility to safeguard the organization's integrity, transparency, and finances. PTK's members, students, and broader community deserve more than inaction from those entrusted to provide oversight.

The issues are dire and appear to stem directly from top-level decisions. Misleading statements about supposed "exclusive scholarships" have fueled recruitment under false pretenses. Financial reports reveal a drastic shift from a $4.7 million surplus to a $900,000 deficit—an alarming $5.6 million swing—while those in senior leadership benefited from significant salary increases. This misalignment of priorities raises serious doubts about accountability. The hiring of close associates in senior roles only deepens concerns over conflicts of interest and a disregard for ethical standards.

Equally concerning is the reported toxic workplace culture marked by bullying, favoritism, and retaliation. These conditions undermine employee morale and deter talented individuals who genuinely wish to advance PTK's mission. Such widespread issues suggest systemic failures that can only continue if the Board chooses not to address them.

I share these concerns because I believe deeply in PTK's core mission: to honor and support students. By investigating these matters and demanding accountability, you can restore trust among members, staff, and the broader public. Failure to

address these *red flags* endangers PTK's reputation and weakens the very principles upon which it was founded.

I remain optimistic that, with swift action and a renewed commitment to accountability, PTK can emerge stronger than ever. Thank you for your attention to these concerns.

Sincerely,
Toni Marek

On Thu, Jan 16, 2025 at 9:55 AM Toni Marek <tonimarek@gmail.com> wrote:

Dear Phi Theta Kappa Board of Directors,

I am reaching out to you with a heavy heart and a clear conscience. Attached is an open letter that outlines significant concerns about Phi Theta Kappa under the leadership of CEO Lynn Tincher-Ladner, along with evidence supporting these claims.

The issues outlined—false advertising, financial mismanagement, nepotism, toxic workplace culture, and governance failures—are not isolated incidents. Together, they paint a troubling picture of systemic problems that threaten PTK's mission and reputation. As Board members, you have a fiduciary duty to address these issues with urgency to protect PTK's legacy and ensure it operates transparently and ethically for the benefit of its members and the public.

*What's Included in This Open Letter Packet:*

1. **Public Records Evidence:** Documentation from Palomar and Grayson Colleges showing the misleading nature of PTK's "Top 10%" marketing claims.
2. **Examples of False Advertising:** PTK's promotional materials and email campaigns promising unsubstantiated benefits, such as "$246 million in exclusive scholarships."
3. **Social Media Posts:** Real-life examples of members who trusted PTK's claims and were misled.
4. **Glassdoor Reviews:** Detailed accounts from former employees describing a toxic workplace culture and systemic issues within PTK's leadership.

*Why This Matters:*

These problems have real-world consequences for the students, advisors, and colleges that trust PTK. The revolving door of executives, the departure of talented employees, and the documented culture of intimidation and secrecy highlight the urgent need for reform. The Board must investigate why these issues persist and take immediate action to protect PTK's mission of honoring academic excellence.

*What I Ask of You:*

Please review the attached letter and evidence in full. Reach out to the employees, former staff, and stakeholders who can provide firsthand insights into these issues. PTK has the potential to inspire and uplift students, but it cannot fulfill that promise without meaningful changes to its leadership and governance.

If you have any questions or would like further clarification, I am available to discuss this at your earliest convenience.

Sincerely,
Toni Marek
Founder, *And Then She Spoke Up*
PTK Lifetime Member and Former International Officer
tonimarek@gmail.com

JONATHAN G. POLAK
317.713.3532
JPolak@taftlaw.com

January 22, 2025

**Via Email**

Toni Marek
tonimarek@gmail.com

      Re:    Response to false allegations-Phi Theta Kappa

Ms. Marek,

      I am counsel to Phi Theta Kappa Honor Society ("PTK") and write to respond to your communication to the PTK Board on or about January 16, 2025, which you titled as an "Urgent Open Letter." The Board has reviewed your letter and authorized me to provide you this response. It takes allegations like those identified in your letter seriously, but the statements you make are misinformed, and appear to us to be the result of manipulation by our current litigation opponent, HonorSociety.org, Inc. ("Honor Society"), and its President, Michael Moradian.

      As you know, PTK filed a trademark infringement and unfair competition lawsuit against Honor Society in 2022 (the "Lawsuit"). Honor Society has since brought claims against PTK alleging, in part, false advertising claims that mirror those asserted in your letter. At no time prior to Honor Society making those allegations has anyone complained of the veracity of PTK's advertising. It was only after Honor Society chose to assert meritless claims in the lawsuit that PTK has had to explain the basis of its advertising. The timing and substance of your letter demonstrate a relationship to Honor Society and Mr. Moradian that cannot be ignored when considering your allegations.

**PTK's public statements are true.**

*The Top 10% claim.*

      PTK rightly advertises that its membership is in the top 10% of students at the community colleges it serves. While it is true that PTK's Constitution, written in 1918, requires colleges to set their criteria no lower than 3.0 GPA, PTK's data shows that the overwhelming majority of the PTK chapters, in consultation with the colleges themselves, require a 3.5 GPA or higher to become a PTK member.

      PTK's advertisement that it invites the top 10% of students stems from a careful analysis of publicly available data regarding the number of students attending community colleges verses

Toni Marek
January 22, 2025
Page 2 of 8

the number of students invited to join PTK each year. PTK's research has determined that it is inviting students are in the top 10% of their college's student population, and PTK has been thoroughly transparent in communicating this to the public by documenting that analysis on this page of its website: https://www.ptk.org/benefits/prestigious-recognition/ which links to this report: https://www.ptk.org/wp-content/uploads/Percentage-Of_Students_Invited_PTK.pdf. In our assessment of this datapoint, PTK takes into account the comprehensive mission of community colleges in providing the first two years of a four-year degree as well as their work in workforce development, career and technical skills training, and dual enrollment/dual credit education. PTK includes all such students it its analysis, and relies on the colleges to report "top" grade earners to PTK as nominations of student names and contact information for their PTK chapter. PTK provides email invitations to students as a service to the colleges.

Given that nearly all research on community colleges is directed towards their high (nearly 50%) drop-out rates, poor retention and completion rates at the two-year, and even lower at the four-year level; how would it even appear as though PTK is untruthful in its 10% assertion? Community colleges do their very best to serve the highest levels of minority, low income, first generation, and underrepresented student populations—groups that are not always poised to have success in college. Mr. Moradian does his best to tie grade inflation to his claims—relying only on available research on GPA and student performance that is based solely on datasets from four-year colleges. I will note that there is research-based evidence that community colleges do not suffer "grade inflation" as their four-year counterparts do. (https://www.insidehighered.com/news/2016/03/29/survey-finds-grade-inflation-continues-rise-four-year-colleges-not-community-college).

You make reference to a "FOIA" request in your letter, and information you claim you received from Grayson College. We have seen similar FOIA requests by Mr. Moradian and Honor Society that are being used in the Lawsuit. The data for Grayson College provided to you by Ms. Hicks is inconsistent with IPEDS data that is publicly available. For that reason, we believe that the information you are relying on is flawed. Also, Professor Mary Linder, who sits on the Board of Directors and oversees the invitations to PTK for Grayson College confirms this, and stated Grayson was not inviting the percent of students indicated in your email.

I note that you have submitted similar documentation to Attorneys General in Illinois and Florida. We reviewed those documents as well, and they too evidence the same "bad math" employed by Mr. Moradian in making his similar false advertising claims against PTK. They incorrectly sought only full-time enrollees at the various community colleges, not the count for all students enrolled in the school. For example, your submission to those Attorneys General as to Holyoke Community College suffers this defect. The college's response states clearly on the table that it refers to "GPA statistics of all students who completed 12 hour credits in a semester." That metric excludes all other enrollees in community college and is not the population that is the subject of PTK's "top 10%" claim. The Coast Community College District information you provided to the Attorneys General also does not provide any information as to what population is measured, but through the litigation we have seen that it also fails to pull data from the entire proper universe of students. Triton College similarly did not provide any information as to what

Toni Marek
January 22, 2025
Page 3 of 8

data set it was comparing against – total population of enrollees for the entire semester, or a snapshot in time of full-time enrollees.

In short, PTK's public statements around the "top 10%" claim are true, and we do not find your arguments compelling because they are based on flawed or unreliable information.

*The scholarship claims.*

Your characterization of the average and total scholarships available to PTK members is also a false recast of Honor Society's claims in the lawsuit. The reality is that PTK members, on average, receive far more than the $2,500 referenced your letter. In fact, it is closer to $4,500, based on PTK's analysis. PTK offers a database of scholarships (PTK Connect) that contains hundreds of member-exclusive scholarships. Additionally, the database contains all scholarship opportunities open to any community college transfer student (with or without PTK status), because many of these scholarships can stack, and students should and need to be aware of all scholarship opportunities to maximize their financial aid during the transfer process. PTK's exclusive scholarship offerings come from a variety of sources, including the PTK Foundation , PTK's corporate partners, and PTK's four-year collegiate partners.

PTK is extremely proud of being the largest scholarship provider to community college students, and without question, it can and has demonstrated the availability of hundreds of millions of dollars in scholarships both in its testimony in court, and to all students interested in joining PTK for these benefits. PTK's exclusive scholarship offerings come from a variety of sources, including the PTK Foundation, PTK's corporate partners and donors, and PTK's four-year collegiate partners. PTK discloses at length how its scholarships are structured, the requirements for each, and how PTK membership affects eligibility. See https://www.ptk.org/scholarships/how-our-scholarships-work/. The total amount of transfer scholarships by PTK's four-year colleges and university partners is significant. *See* https://www.ptk.org/wp-content/uploads/ptk_exclusive_scholarship_study.pdf.

PTK offers to its members a database of scholarships (PTK Connect) that contains hundreds of member-exclusive scholarships. Additionally, the database contains all scholarship opportunities open to any community college transfer student (with or without PTK status), because many of these scholarships can stack, and students should and need to be aware of all scholarship opportunities to maximize their financial aid during the transfer process. PTK's exclusive scholarship offerings come from a variety of sources, including the PTK Foundation, PTK's corporate partners and donors, and PTK's four-year collegiate partners. PTK estimates the scholarships to its students based on the methodology and calculations published here: https://www.ptk.org/wp-content/uploads/ptk_exclusive_scholarship_study.pdf. You should note that the statements are researched, evidenced and clear. Further, PTK discloses at length how its scholarships are structured, the requirements for each, and how PTK membership affects eligibility. See https://www.ptk.org/scholarships/how-our-scholarships-work/.

Toni Marek
January 22, 2025
Page 4 of 8

Furthermore, PTK's four-year collegiate partners log in to PTK Connect and report all scholarships for PTK members. This includes the title, amount, and requirements of each scholarship. Collegiate partners must indicate if any scholarship is a member-exclusive scholarship. Currently, PTK Connect contains 3,587 scholarships. Of those scholarships, 806 are exclusive to PTK members. The average of all member-exclusive scholarship is $4,617, making PTK's advertisements and promotions containing said statement factual (or at best, an understatement, and certainly far more than $2,500).

In contrast to this documentation, you offer no evidence that supports your claim that "many counted scholarships are publicly available to all transfer students [and] not exclusive to PTK members." Your naked allegation is simply untrue and easily disprovable, as shown above. You also claim that "the true average PTK member receives no scholarships at all . . .", another claim that is entirely baseless. This statement is similarly unevidenced and undocumented. Mr. Moradian has made the same false claims in the Lawsuit, and we have shown to him that the claims are unprovable as well. Ironically, you have falsely reported in the past that you received no scholarship from PTK, yet that is also demonstrably untrue. You received a scholarship and we have documentation to prove it.

*Alleged financial mismanagement.*

The Board reviews the financial statements of PTK on an annual basis. While it is aware of declining revenues, those declines are directly attributable to Honor Society. That is part of the damages that we are seeking in PTK's lawsuit. The lawsuit has also been expensive, but the fight is worth it since the fight is to prevent further deception by Honor Society of community college students.

Dr. Tincher-Ladner's salary is reviewed annually and approved by the Board. The Board is satisfied that her salary is consistent with industry standards and is reasonable compensation under the circumstances of her employment.

*Alleged nepotism.*

The claim that PTK, and Dr. Tincher-Ladner in particular, has engaged in nepotism is also false. Dr. Courtney Lange, Dr. Tincher-Ladner's wife, is currently serving as the Senior Director of Special Initiatives with the Phi Theta Kappa Foundation, an entirely separate nonprofit organization from PTK, and her position is fully funded through a grant received by the PTK Foundation in 2023. Dr. Tincher-Ladner has no operational role with the Phi Theta Kappa Foundation, and also had no authority over the decision to hire Dr. Lange. The Phi Theta Kappa Foundation has its own Executive Director and senior leadership team, and it was their decision to hire Dr. Lange. Moreover, Dr. Lange's salary is not paid for by membership dues in PTK, since they are separate organizations.

Dr. Lange has had a distinguished career in the community college space in her own right. She has worked in that space for nearly 15 years. (https://www.linkedin.com/in/courtney-lange-

Toni Marek
January 22, 2025
Page 5 of 8

bb1a75211/).  She served as the Marketing Communications Specialist for Holmes Community College in Hinds County, Mississippi from 2010 to 2013.  She then joined PTK (the honor society, not the Foundation) in 2013 as its Director of Regional and Chapter Development, prior to when Dr. Tincher-Ladner was elevated to the CEO position.  Dr. Lange left PTK in 2016 to become the Director of Communications and Impact with the Woodward Hines Education Foundation, a non-profit assisting community college students to move on to four-year institutions.  In 2023, on this long history of employment helping community college students, she then joined Phi Theta Kappa Foundation as described above.  She was hired by Dr. Monica Marlowe, the Executive Director, who has known Dr. Lange for nine (9) years.

There is no prohibition against Dr. Lange's employment with Phi Theta Kappa Foundation, or PTK before that.  Your complaint does not recite any authority either.  Under these circumstances, there is no basis to the accusation that PTK's member dues have been misrouted for Dr. Tincher-Ladner's personal benefit.

PTK is highly transparent, consistent with its obligations as a 501(c)(3) organization.  Its financials are audited by a respected accounting firm in Jackson, Mississippi, the location of its headquarters.  And PTK publishes its audited financials as required by law.  Further, it regularly accomplishes its mission of serving the interest of community college students in the United States, and where applicable, internationally.  There is no credible criticism of its integrity as an organization.

*Allegations concerning workplace culture.*

Your allegations concerning the culture at PTK are also unfounded.  Your letter offers us no specificity as to the allegations, other than anonymous postings on the Glassdoor website.  Also, your attached documents do not make any reference to the far more numerous positive postings about PTK.  Under these circumstances, your letter offers no real evidence of the culture you describe in your letter.

**Influence of Michael Moradian.**

We strongly believe that your letter to the Board is as Mr. Moradian's proxy, and the strength of your complaints must be evaluated in that context. It is concerning that you choose to attack PTK and at the same time align yourself with an organization that has a true track record of deceiving students.  As you know, we have attempted to obtain your communications with Mr. Moradian, but you have ignored our subpoena for the records.

Honor Society is actually not an honor society, despite its efforts to market itself otherwise. It is a for-profit, money making scheme hatched by Mr. Moradian over ten years ago.  No minimum academic performance (or even enrollment) of any sort is required to join its membership, although it is likely many misled students may believe that membership in Honor Society has some academic significance when it does not (likely due to its misleading name).  All that is required to join is an email address and a credit card, with those credit card charges often times being

Toni Marek
January 22, 2025
Page 6 of 8

challenged as unauthorized. In fact, it was because of these allegedly unauthorized charges that PTK learned of actual consumer confusion. Those same students would contact PTK to complain about the subsequent charges because they understood PTK to only charge a single fee, only to learn that they had joined the wrong organization. Honor Society is marketing itself to community college students using the same branding scheme (i.e., "trade dress") as PTK, which PTK believed was and still is leading students to join Honor Society thinking they were joining PTK. This confusion persists to today because Honor Society has refused to change its marketing and membership solicitation practices.

PTK had a recent situation where Honor Society had charged a student's credit card over $900, where that student had mistakenly joined Honor Society thinking it was PTK. It is unclear whether the student was able to secure a complete refund – Honor Society will typically only refund charges made within the last 90 days. https://www.honorsociety.org/cancel. And as Honor Society charges its members every sixth months, refunds beyond the most recent charge are unlikely.

Truth in Advertising recognized the predatory marketing practices of "Honor Society" in April of 2020 (See: https://truthinadvertising.org/articles/honorsociety-org/). The Association of College Honor Societies has issued a warning to the public about Honor Society. https://www.achshonor.org/is-this-invitation-legit- A simple internet search for HonorSociety.org reviews reveals a long history of public complaints about that organization and its business practices.                    (https://www.bbb.org/us/nv/las-vegas/profile/professional-organizations/honorsocietyorg-inc-1086-90026685/complaints) We include some of those here for your review. These online warnings, unfortunately, has not deterred Honor Society to change its behavior.

Honor Society's misconduct in this case has not been limited to merely meritless allegations in the lawsuit. It has also engaged in harassing and misleading extra-judicial conduct that included a malicious survey about PTK sent to hundreds of thousands of community college students, and the use of generative artificial intelligence to create overnight 5,000+ websites containing the same deceptive, false and meritless allegations contained in Honor Society's claims against PTK and reflected in your letter to PTK.

In response to these tactics, PTK has had to go to court not once, but twice, to obtain the extraordinary remedy of preliminary injunctive relief. In both instances, PTK has prevailed and Honor Society has lost. In the court's first Order, the Judge found the survey referenced above to be "malicious" and designed only to cause PTK damage. In the most recent injunction order, District Court Judge Carlton Reeves condemned the use of generative AI to malign PTK on such a large scale, especially where the web pages were as misleading and deceptive as they were. At the conclusion of his Order, Judge Reeves identified Executive Director, Michael Moradian, as a "petulant cyberbully" in his misconduct.

Notwithstanding two injunction orders, both powerfully worded by the court, Honor Society appears to have learned no lessons. PTK also had to file a motion for contempt against

Toni Marek
January 22, 2025
Page 7 of 8

Honor Society on August 29, 2024, on Honor Society and Moradian's failure to comply with the Court's second preliminary injunction order. On December 23, 2024, the Court found Honor Society and Mr. Moradian in contempt, and sanctioned Honor Society $1,000 for every day it remained in contempt. Notably, the timing of your letter correlates with Honor Society's continued efforts to hurt PTK. There also is pending a motion for "death penalty" sanctions against Honor Society for its misconduct in this litigation, including alleged perjury and witness tampering.

I raise these facts concerning Honor Society's litigation record in this lawsuit because you need to understand who you have aligned yourself with and where you are getting your information from.

**Change.org Postings and Communications with PTK Members.**

We are also aware of your recent creation of a posting at www.change.org, where you not only repeat the same false allegations in your letter to the Board, but you also invite others to join you in repeating those same false claims. Those postings must cease immediately and we require you to take down the false statements made in them. Further, you are instructed to immediately cease in your communications with past and current PTK members where you are repeating this same false information.

**Efforts to Depose You.**

We have also attempted to obtain your communications with Honor Society as well as your deposition. You have wholly ignored the subpoena served by my office, other than filing a baseless Motion to Quash. This is despite clearly injecting yourself in the lawsuit as a witness. It is odd that you would avoid the deposition we seek, while at the same time send this letter making the demands that you have of PTK. I invite you to contact me so that we may arrange the date and time of your deposition.

**Cease and Desist.**

Demand is made upon you by PTK to immediately cease and desist in making the false and defamatory statements contained in your letter about PTK and Dr. Tincher-Ladner. This includes but is not limited to online postings, emails, text messages and any other efforts to distribute your misinformation. Both PTK and Dr. Tincher-Ladner reserve all rights, legal and equitable, concerning your misconduct. Failure by you to abide by this demand will lead to legal action against you.

Toni Marek
January 22, 2025
Page 8 of 8

Very truly yours,

Jonathan G. Polak
Counsel to Phi Theta Kappa

JGP
Encls.

Ex. A.  First Preliminary Injunction
Ex. B.  Second Preliminary Injunction
Ex. C.  Civil Contempt Order

# EXHIBIT 5






